UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No.: 3:16-cr-20 |
| v. ) | |
| ) | JUDGE COLLIER |
| VICKI BORDEN, ) | |
| ) | |
| Defendant. ) | |

**PLEA AGREEMENT**

The United States of America, by the United States Attorney for the Eastern District of Tennessee, and the defendant, Vicki Borden (hereinafter referred to "the defendant" or "Defendant Borden"), and the defendant's attorneys, Joseph E. Costner and Sarah Bean Smith, have agreed upon the following:

1. The defendant will plead guilty to the following count in the Superseding Indictment: Count One that alleges a conspiracy to commit mail fraud and wire fraud, in violation of Title 18, United States Code, Section 1349.

The punishment for this offense is as follows: up to twenty (20) years imprisonment, a fine of not more than $250,000, not more than three (3) years supervised release, and a mandatory assessment of $100, in addition to any applicable forfeiture and restitution.

2. The defendant has read the Superseding Indictment, discussed the charges and possible defenses with defense counsel, and understands the crimes charged. Specifically, the elements of the offense in violation of Title 18, United States Code, Section 1349 to which the defendant has agreed to plead guilty are as follows:

    a.) that there existed an agreement between two or more persons to commit

Defendant's Initials _VB_

(i) mail fraud, an offense against the United States, that is, with the intent to defraud, to knowingly and willfully devise and intend to devise and to participate in a scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and omissions, and for the purpose of executing such scheme and artifice, knowingly causes any matter or thing to be sent and delivered by mail or commercial interstate carrier, in violation of Title 18, United States Code, Section 1341; or

(ii) wire fraud, an offense against the United States, that is, with the intent to defraud, to knowingly and willfully devise and intend to devise and to participate in a scheme and artifice to defraud, and to obtain money by means of materially false and fraudulent pretenses, representations, and omissions, and for the purpose of executing such scheme and artifice, to cause to be transmitted by means of wire in interstate commerce, writings, signs, and signals, in violation of Title 18, United States Code, Section 1343; and

b.) that the defendant knowingly and voluntarily joined and participated in the conspiracy.

3. In support of the defendant's guilty plea, the defendant agrees and stipulates to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

a.) From on or about February 1, 2008, through in or about April 2013, within the Eastern District of Tennessee, and elsewhere, Defendant Borden, in violation of Title 18, United States Code, Section 1349, with the intent to defraud, did knowingly and willfully conspire, combine, confederate, and agree with, among other employees of Pilot Travel Centers LLC (Pilot),

2

Defendant's Initials [signature]

Mark Hazelwood (Hazelwood), Scott Wombold (Wombold), John Freeman (Freeman), Brian Mosher (Mosher), Arnie Ralenkotter (Ralenkotter), Jay Stinnett (Stinnett), Chris Andrews (Andrews), Kevin Clark (Clark), Scott Fenwick (Fenwick), John Spiewak (Spiewak), Katy Bibee (Bibee), Lexie Holden (Holden), Heather Jones (Jones), Ashley Judd (Judd), Karen Mann (Mann), Holly Radford (Radford), and Janet Welch (Welch),

(i) to commit wire fraud, an offense against the United States, that is, with the intent to defraud, to knowingly and willfully devise and intend to devise, and to participate in, a scheme and artifice to defraud certain interstate trucking companies and for obtaining money from certain interstate trucking companies by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, cause to be transmitted by means of wire in interstate commerce, writings, signs, and signals, in violation of Title 18, United States Code, Section 1343; and

(ii) to commit mail fraud, an offense against the United States, that is, with the intent to defraud, to knowingly and willfully devise and intend to devise, and to participate in, a scheme and artifice to defraud certain interstate trucking companies and for obtaining money from certain interstate trucking companies by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to knowingly cause matters and things to be sent and delivered by mail and commercial interstate carrier according to the direction thereon, in violation of Title 18, United States Code, Section 1341 (hereinafter "the conspiracy").

**Pilot Travel Centers LLC and its Direct Sales division**

b.) From 2008 through April 2013, Pilot Travel Centers LLC ("Pilot"), headquartered in Knoxville, Tennessee, sold billions of gallons of diesel fuel to interstate trucking

3

Defendant's Initials ‾𝒱ℬ

companies each year from its hundreds of truck stops across the country. During that time, Pilot competed with other truck stop chains for trucking company diesel fuel purchases, including but not limited to, Love's, Travel Plazas of America (often referred to as "TA"), and until its merger, Flying J. Pilot's Direct Sales division ("Direct Sales") was responsible for marketing the sale of Pilot's diesel fuel to the interstate trucking industry.

**Defendant Borden**

c.) Defendant Borden was employed in Pilot's Direct Sales division from before 2008 through April 2013 and held the title of director during that time. Defendant Borden worked at Pilot's headquarters in Knoxville, Tennessee and supported the marketing of the sale of Pilot's diesel fuel to interstate trucking companies. During 2008 through April 2013, Defendant Borden was at times supervised by Hazelwood who oversaw the entire Direct Sales division and other times supervised by Wombold. During 2008 through 2013, Defendant Borden assisted with the supervision of inside sales representatives Bibee, Holden, Jones, Judd, Mann, Radford, and Welch, who also worked at Pilot's headquarters in Knoxville, Tennessee.

**The Materiality of Diesel Fuel Discount Representations to Trucking Companies**

d.) Pilot's Direct Sales Manual ("Pilot-DSM") is a record of regularly conducted business activity of Pilot. In her capacity as a director in the Direct Sales division, Borden oversaw the updating and revision to the Pilot-DSM from December 2007 through February 2008. In updating the Pilot-DSM at that time, Borden emailed the Pilot-DSM for review to Freeman, Ralenkotter, and Stinnett, and requested that the revised Pilot-DSM be read by Bibee, Jones, Mann, Radford, and Welch. When completed by Borden, the revised Pilot-DSM described itself as "a guideline" for the Direct Sales division "designed to increase Pilot's market share in the increasingly competitive truck stop/travel center business." The Pilot-DSM stated that "fuel is a

4

Defendant's Initials

trucking company's <u>largest</u> variable cost" and that "[a]n effective way for us to sell fuel is through discounts to trucking companies." Confirming that fuel discounts have consistently been important, and material, to any trucking company's fuel-buying decision-making, the Pilot-DSM further stated that "[d]iscounts on fuel gives the trucking company an incentive to buy fuel at Pilot because it helps them save money on their fuel purchases." The Pilot-DSM also explained that offering fuel discounts to trucking companies would be instrumental to expanding Pilot's market share in the truck stop business: "With our network of travel centers and low pump prices, discounts will play a major role in building gallons for Pilot." But the Pilot-DSM cautioned, "[r]emember that discounts affect our profitability negatively. . . . Discounts ultimately affect the P & L [Profit and Loss] on the customer, which in turn affects your commission."

**Cost-Plus Discounts**

  e.) According to the Pilot-DSM, "Cost Plus is a pricing format where the trucking company pays an industry determined wholesale 'index' price plus a pumping fee" – hereinafter referred to as a Cost-Plus Discount. The Pilot-DSM further stated that a Cost-Plus Discount "is an alternative pricing strategy that may be necessary for competitive reasons."

    (i) "<u>Cost</u>." According to the Pilot-DSM, the "[t]ruck stop industry standard for 'cost' in cost plus programs" is the "OPIS contract average of the rack that supplies a predetermined truck stop." The Pilot-DSM further stated that "OPIS" is the "<u>O</u>il <u>P</u>rice <u>I</u>nformation <u>S</u>ervice," which is "a company that collects posted wholesale fuel prices at each rack and provides this service to the trucking/truck stop industry." According to the Pilot-DSM, a "rack" is "the wholesale distribution point for petroleum products."

    (ii) "<u>Plus</u>." According to the Pilot-DSM, the "pumping fee" or "pump fee" (hereinafter "Pump Fee") is "the 'plus' in the cost plus" and is the "amount added by the truck

5

Defendant's Initials _[initials]_

stop chain, presumably as margin to the cost plus equation." The Pump Fee is expressed as cents, such as $.04 (four cents), and, according to the Pilot-DSM, "can range from Standard Cost Plus $.02 to Cost Plus $.08." A Cost-Plus Discount was typically expressed in an abbreviated form, such as "CP .0_" or "cp .0_." The higher the Pump Fee, the lower, or comparatively worse, the Cost-Plus Discount becomes for the trucking company customer. For example, a CP .06 is a comparatively worse Cost-Plus Discount than a CP. 03 by three cents ($.03) per gallon. For some customers, typically those customers to whom Pilot was required to offer a substantial per gallon discount to prevent the customer from purchasing diesel fuel from a Pilot competitor, the Pump Fee could even be expressed as "Minus," that is, cost *minus* a specified Pump Fee amount, such as Cost-Minus .03.

(iii) <u>"Cost" varied by OPIS rack market</u>. There was not a single OPIS daily contract average that generated a single "cost" to be applied uniformly to every gallon of diesel fuel sold at every Pilot truck stop across the country on the same day. Instead, the hundreds of Pilot truck stops across the country often were tied to different OPIS rack markets, referred to as "racks" in the Pilot-DSM, each of which generated its own daily OPIS Contract Average that was used, as stated in the Pilot-DSM, as the industry standard for "cost" in the Cost-Plus Discounts to be applied at each "predetermined truck stop."

**Application of Cost-Plus Discounts**

f.) Cost-Plus Discounts represented to trucking company customers by Direct Sales division personnel were typically applied in the following two ways – Off-Invoice or Rebate.

(i) <u>Cost-Plus Discount Application to an Off-Invoice Customer.</u> "Off-Invoice" customers were those trucking company customers who received their Cost-Plus Discounts for diesel fuel purchased from Pilot when Pilot billed those customers, through an invoice, for diesel fuel purchased from Pilot during the billing period. Off-Invoice customers did not pay Pilot's retail

6

Defendant's Initials ᴠʙ

price for diesel fuel at the pump at the time of sale. Rather, Off-Invoice customers were not required to pay Pilot for their diesel fuel purchases until they received Pilot's invoice, on which the "Invoice Total" was presented to the customer as including whatever discount that had been represented to induce diesel fuel purchases from Pilot, by the invoice's stating both a "Retail Total" and an "Invoice Total." As the Pilot-DSM put it:

> "Off invoice billing consists of billing the customer net of discounts earned. The cost plus invoice represents the gallons purchased at the re-priced amount, which reflects the customer's cost plus deal."

(ii) <u>Cost-Plus Discount Application to a Rebate Customer.</u> "Rebate" customers were those trucking company customers who received their Cost-Plus Discounts for diesel fuel purchased from Pilot when Pilot sent those customers a rebate amount, by way of check or Automated Clearing House (ACH) electronic payment, which typically was sent monthly. Rebate customers paid Pilot's retail price for diesel fuel at the pump at the time of sale. Rebate customers did not obtain the Cost-Plus Discount that was represented to induce diesel fuel purchasing from Pilot until Pilot provided those customers with their monthly rebate amounts calculated by Pilot personnel.

**Commission-Based and Profit-Driven Compensation**

g.) Pilot's Direct Sales division employees, including Defendant Borden, earned commission-based compensation that was driven by the profitability of Pilot's trucking company accounts.

**Manner and Means of the Conspiracy**

h.) The conspiracy's goals and its criminal objects were achieved by perpetrating a scheme to defraud certain interstate trucking companies by:

7

Defendant's Initials *[initials]*

(i.)   identifying trucking companies from Pilot's pool of existing and prospective customers perceived to be unlikely to detect false pretenses, promises, and representations regarding Cost-Plus Discounts;

(ii.)   inducing, and attempting to induce, such identified trucking companies to choose to purchase, and to continue to purchase Pilot's diesel fuel by falsely and fraudulently promising and representing Cost-Plus Discounts, with such false and fraudulent pretenses, promises, and representations being made orally to some victim customers, in writing to other victim customers, and to some victim customers both orally and in writing;

(iii.)   lulling, and attempting to lull, targeted trucking companies into believing that Pilot was honestly and accurately applying represented Cost-Plus Discounts by mailing, emailing, transmitting, and otherwise sending fraudulently-generated invoices, rebate amounts, and rebate checks that maintained the false pretense that Pilot was honestly and accurately applying represented Cost-Plus Discounts, and thereby also facilitated the concealment of the conspiracy and scheme;

(iv.)   inducing, and attempting to induce, such identified trucking companies to continue to purchase Pilot's diesel fuel by mailing, emailing, and otherwise sending fraudulently-generated documentation that purported to show, and thereby maintain the false pretense and attempt to lull targeted trucking companies into believing, that Pilot had been honestly and accurately applying represented Cost-Plus Discounts, and thereby also, facilitate the concealment of the conspiracy and scheme; and

(v.)   providing false and fraudulent explanations, often by email and telephone, to targeted trucking companies when such companies questioned the application of the represented Cost-Plus Discounts to their diesel fuel purchases from Pilot.

8

Defendant's Initials

i.) The execution and attempted execution of the conspiracy's scheme to defraud continued through one or both of the following methods:

(i.) <u>Off-Invoice Fraud</u>. For customers whose falsely and fraudulently represented Cost-Plus Discounts were to be included in the "Invoice Total" amount that was stated on Pilot's regularly billed and sent invoices, the conspirators executed and attempted to execute the scheme to defraud by deliberately and fraudulently not submitting the represented Cost-Plus Discounts to Pilot's billing system for Off-Invoice customer billing.

(ii.) <u>Rebate Fraud</u>. For customers whose falsely and fraudulently represented Cost-Plus Discounts were to be provided to the customer in the form of a monthly rebate check, the conspirators executed and attempted to execute the scheme to defraud by deliberately and fraudulently withholding, by various ways, the full rebate amount due to those customers derived from the represented Cost-Plus Discounts.

**Goals of the Conspiracy**

j.) The goals of the conspiracy included:

(i) increasing Pilot's market share of diesel fuel sales over its competitors;

(ii) maximizing Pilot's profit for each gallon of diesel fuel sold to trucking companies targeted by the conspiracy;

(iii) maximizing the conspirators' potential for profit- and commission-based compensation from trucking companies targeted by the conspiracy; and

(iv) competing with and achieve recognition among each other, while placing Pilot's market-share expansion and profit growth above honesty and fair dealing in disregard of the Pilot Code of Ethics and Business Conduct.

9

Defendant's Initials ⎯⎯

## Defendant Borden's Knowing and Voluntary Participation in the Conspiracy

k.) On or about November 13, 2008, Freeman, Stinnett, Defendant Borden, and Radford, using their respective Pilot email accounts, had the following email communications:

(i.) Radford sent an email to Stinnett that attached a spreadsheet entitled "Jay's Monthly Savings.xls" that contained the following column headings: "Account", "Original", "Sent", and "Savings." For example, the following information was stated on the spreadsheet for Pilot trucking company customer RWH:

| Account | Original | Sent | Savings |
|---|---|---|---|
| RWH | $64,521.62 | $32,540.79 | $31,980.83 |

The difference between the "Original" amount and the "Sent" amount derived the so-called "Savings" amount attributed to RWH, which was added to the so-called "Savings" amounts attributed to other customers listed on the same spreadsheet to total in the aggregate "$115,525.35." Stinnett then forwarded that spreadsheet entitled "Jay's Monthly Savings.xls" to Freeman and Defendant Borden with the message:

"Good number . . . . 115,000 dollar 'screw'"

and, in doing so, referred to the $115,525.35 not as a "savings" amount, but as a "screw" amount.

(ii.) Defendant Borden replied to Stinnett's "115,000 dollar 'screw'" email, and cc-copying Freeman, with the response: "You are the best!"

## JTL

l.) JTL is a trucking company located in Wisconsin that was a Rebate Fraud victim of the conspiracy that was harmed by Defendant Borden's participation in the conspiracy.

m.) On or about May 16, 2008, Mosher, from his Pilot email account, in furtherance of the conspiracy, sent Jones the following email:

10

Defendant's Initials ZB

> "We are going to give JTL Trailers... Cost Plus .04 / .04 off retail. They will
> think it is Cost Plus .02 / .04 off retail. Anyway. Go ahead and get a check
> out to them for their April gallons."

n.) To facilitate additional fraudulent rebate reductions to JTL's monthly rebate amounts in furtherance of the conspiracy, Jones and Mosher, using their respective Pilot email accounts, emailed each other monthly spreadsheets. For example, on or about November 12, 2008, Jones, from her Pilot email account, emailed Mosher a spreadsheet entitled "Approval Sheet Manual Rebates for Oct 2008.xls" that stated a rebate amount for JTL of "$17,593.23" for "October Gallons" with a "Discount Used" to calculate the rebate amount of "R-.045/CP.04," which was a worse Cost-Plus Discount than had been represented to JTL.

o.) Then, on or about November 13, 2008, Mosher, in furtherance of the conspiracy, from his Pilot email account, emailed Jones a revised spreadsheet with the same title that added the number "9000" in the column next to JTL's "Oct-08" amount of "$17,593.23," which appeared to be a direction from Mosher to reduce JTL's rebate for the month of October 2008 from $17,593.23 to approximately $9,000.

p.) Then, on or about November 13, 2008, after Jones received that revised spreadsheet from Mosher, Jones, in furtherance of the conspiracy, sent Defendant Borden an email with the subject "FW: BM-CS Manual rebates" that attached the revised spreadsheet from Mosher, and stated to Defendant Borden:

> "Brian did send me this spreadsheet to work from. I was not able to get the
> final numbers together for commissions, but wanted to send it to you in case
> you want to estimate."

The spreadsheet that Jones attached to, and referenced in, her email to Defendant Borden provided in furtherance of the conspiracy the following information for JTL:

Discount Used        October Gallons        October-08:

11

Defendant's Initials _TB_

R -.045/CP.04          49,074.92              $17,593.23       9000

  q.)  On or about November 17, 2008, Jones presented a "Check Request" to Defendant Borden for her approval of the issuance of a "Rebate for October 2008" to JTL for $9,005.12. On or about November 17, 2008, Defendant Borden approved Jones's check request for JTL. On or about November 20, 2008, a rebate check that had been fraudulently calculated by Jones and Mosher the issuance of which had been approved by Defendant Borden in the amount of $9,005.12 was sent to JTL in Wisconsin by way of interstate commercial carrier, namely FedEx.

  r.)  Having previously received the above-described email and spreadsheet from Jones on November 13, 2008, and having previously received the above-described email and spreadsheet from Stinnett also on November 13, 2008, Defendant Borden agrees that when she received Jones's check request for the $9005.12 rebate payment to JTL, she deliberately ignored a high probability that an unlawful aim of the conspiracy was to commit mail and wire fraud as described above and further agrees that she knowingly and voluntarily joined the conspiracy when she approved the issuance of the $9005.12 rebate check to JTL for its October 2008 diesel gallons purchases.

  s.)  Following November 2008 and through in or about February 2012, in furtherance of the conspiracy, Mosher, Jones, and Defendant Borden caused numerous fraudulently-calculated rebate checks to be sent from Pilot to JTL in Wisconsin that maintained the false pretense, and lulled JTL into believing, that Pilot was honestly and accurately applying the Cost-Plus Discount that Mosher had represented to JTL.

  t.)  On or about April 3, 2009, Defendant Borden had the following email exchange with Ralenkotter through the Pilot email system:

12

Defendant's Initials JB

Case 3:16-cr-00020-CLC-HBG   Document 206   Filed 07/24/17   Page 12 of 19   PageID #: 5014

| Ralenkotter to Defendant Borden | "I know you have a lot on your plate. When the time is right I want to talk with you about having [Pilot Employee 11]'s area do the monthly manual rebates. Janet [Welch] says it take[s] a bunch of her time each month. Frankly we are paying our sales people way too much to be doing jobs that should be done by [Pilot Employee 11]'s group. I know we like for our people to do the manual cp rebates so we can work the discounts but we can do that by having our people approve what [Pilot Employee 11]'s group calculates." |
|---|---|
| Defendant Borden to Ralenkotter | "I agree, but every time I have mentioned it the inside group has no confidence in [Pilot Employee 11]'s group getting it right. I'll call you this afternoon." |
| Ralenkotter to Defendant Borden | "ok" |
| Defendant Borden to Ralenkotter | "Can we talk next week? I am still trying to figure out what corporate accounting did to our budget for March." |
| Ralenkotter to Defendant Borden | "Sure, I'm on spring break with my family the middle of which I will be at the Masters but call me any time. [...]" |
| Defendant Borden to Ralenkotter | "Let me try to come up with a plan on rebates. I don't think we can trust [Pilot Employee 11]'s group. If [Pilot Employee 11] knew how we do them, [Pilot's Chief Financial Officer] would know too. Maybe we just need a rebate queen. Only problem is that they all need to be done at the same time. Let me think on it." |
| Ralenkotter to Defendant Borden | "Ok I feel like [Pilot Employee 11]'s group could do and send to us for approval." |
| Defendant Borden to Ralenkotter | "But I don't want [Pilot's Chief Financial Officer] to know what happens after that..." |
| Ralenkotter to Defendant Borden | "I understand. . . ." |

u.) Defendant Borden agrees that she deliberately ignored a high probability that Ralenkotter's statement in his April 3, 2009 email "I know we like for our people to do the manual cp rebates so we can work the discounts" was in furtherance of an unlawful aim of the conspiracy to commit mail and wire fraud as described above and she further agrees that her email replies to Ralenkotter on the April 3, 2009 demonstrate that she knowingly and voluntarily joined the conspiracy.

13

Defendant's Initials _ℬ_

v.) Prior to the above-described email exchanges with Freeman, Stinnett, Jones, and Ralenkotter, Defendant Borden had agreed to follow the Pilot Code of Ethics and Business Conduct, which in pertinent part stated:

> One of the most important assets of [Pilot] is the trust and confidence of our Customers, Team Members, and of the general public. [Pilot] expects and demands honesty, integrity, discretion and professionalism in both business and personal conduct from all its Team Members. We must apply these standards in both letter and spirit of our everyday activities. Where the letter of the *Code* is not specific, the spirit should prevail.
> * * *
> Each of us must live by our *Code of Business Conduct*. Violators of the *Code* are subject to appropriate discipline, up to and including dismissal from [Pilot] and prosecution under the law.

w.) Defendant Borden agrees that the amount of loss to victim trucking companies that should be attributed to her participation in the conspiracy is more than one-million-five-hundred-thousand dollars ($1,500,000) but less than three-million-five-hundred-thousand dollars ($3,500,000).

x.) Defendant Borden agrees that the total number of victims involved in her participation in the conspiracy exceeds ten (10).

4. The defendant is pleading guilty because the defendant is in fact guilty. The defendant understands that, by pleading guilty, the defendant is giving up several rights, including:

    a.) the right to plead not guilty;

    b.) the right to a speedy and public trial by jury;

    c.) the right to assistance of counsel at trial;

    d.) the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

    e.) the right to confront and cross-examine witnesses against the defendant;

14

Defendant's Initials *VB*

f.) the right to testify on one's own behalf, to present evidence in opposition to the charges, and to compel the attendance of witnesses; and

g.) the right not to testify and to have that choice not used against the defendant.

5. The parties agree that the appropriate disposition of this case would be the following as to each count:

a.) The Court may impose any lawful term of imprisonment, any lawful fine, and any lawful term of supervised release up to the statutory maximum;

b.) The Court will impose special assessment fees as required by law; and

c.) The Court may order forfeiture as applicable and restitution as appropriate.

No promises have been made by any representative of the United States to the defendant as to what the sentence will be in this case. Any estimates or predictions made to the defendant by defense counsel or any other person regarding any potential sentence in this case are not binding on the Court, and may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty plea. The defendant understands that the sentence in this case will be determined by the Court after it receives the presentence investigation report from the United States Probation Office and any information presented by the parties. The defendant acknowledges that the sentencing determination will be based upon the entire scope of the defendant's criminal conduct, the defendant's criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

6. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), and in consideration of all of the terms of this plea agreement in conjunction with the policy statement set forth in United States Sentencing Guidelines § 6B1.2(b) and related commentary, the United States agrees that at the time of sentencing:

Defendant's Initials

15

a.) For sentencing purposes only, the United States will recommend that the loss amount under applicable provisions of the United States Sentencing Guidelines that should be attributed to the defendant for her role in the conspiracy should be within the range of one-million-five-hundred-thousand dollars ($1,500,000) but less than three-million-five-hundred-thousand dollars ($3,500,000), rather than an amount equal to the total loss caused by the entire conspiracy. This agreement by the United States to make this loss attribution recommendation pursuant to Rule 11(c)(1)(B) is not binding on the Court, and if rejected by the Court, may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty plea.

b.) For sentencing purposes only, that the United States will not seek an aggravating role adjustment pursuant United States Sentencing Guidelines § 3B1.1. This agreement by the United States not to seek an aggravating role adjustment at the time of sentencing pursuant to Rule 11(c)(1)(B) is not binding on the Court, and if rejected by the Court, may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty plea.

7. Given the defendant's agreement to plead guilty, the United States will not oppose a two-level reduction for acceptance of responsibility under the provisions of Section 3E1.1(a) of the Sentencing Guidelines. Further, if the defendant's offense level is 16 or greater, and the defendant is awarded the two-level reduction pursuant to Section 3E1.1(a), the United States agrees to move, at or before the time of sentencing, the Court to decrease the offense level by one additional level pursuant to Section 3E1.1(b) of the Sentencing Guidelines. Should the defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for the defendant's offense, including violations of conditions of release or the commission of any additional offense(s) prior to sentencing, the United States will be free to decline to make such motion, to withdraw that motion if already made, and to recommend to the Court that the defendant

16

Defendant's Initials

not receive any reduction for acceptance of responsibility under Section 3E1.1 of the Sentencing Guidelines.

8.  The defendant agrees to pay the special assessment in this case prior to sentencing.

9.  The defendant agrees that the Court shall order restitution, pursuant to any applicable provision of law, for any loss caused to: (1) the victims of any offense charged in this case (including dismissed counts); and (2) the victims of any criminal activity that was part of the same course of conduct or common scheme or plan as the defendant's charged offenses. The United States agrees to advise the Court at the time of sentencing its understanding of all restitution paid to date to victims of the offenses charged in the Superseding Indictment, including restitution payments already made by Pilot Travel Centers LLC.

10.  Financial Obligations. The defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of Court. The defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any time, the defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying the defendant's counsel and outside the presence of the defendant's counsel. In order to facilitate the collection of financial obligations to be imposed with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which

17

Defendant's Initials ⎯⎯

the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. In furtherance of this agreement, the defendant additionally agrees to the following specific terms and conditions:

    a.) If so requested by the United States, the defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs. The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

    b.) The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

    c.) If so requested by the United States, the defendant will promptly execute authorizations on forms provided by the U.S. Attorney's Office to permit the U.S. Attorney's Office to obtain financial and tax records of the defendant.

    11. This plea agreement becomes effective once it is signed by the parties and is not contingent on the defendant's entry of a guilty plea. If the United States violates the terms of this plea agreement, the defendant will have the right to withdraw from this agreement. If the defendant violates the terms of this plea agreement in any way (including but not limited to failing to enter the guilty plea as agreed herein, moving to withdraw his guilty plea after entry, or by violating any court order or any local, state or federal law pending the resolution of this case), then the United States will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, the United States may prosecute the defendant for any and all federal crimes that the defendant committed related to this case, including any charges that were dismissed and any other charges which the United States agreed not to pursue. The defendant

18

Defendant's Initials ZYB

expressly waives any statute of limitations defense and any constitutional or speedy trial or double jeopardy defense to such a prosecution. The defendant also understands that a violation of this plea agreement by the defendant does not entitle the defendant to withdraw the defendant's guilty plea in this case.

12. The United States will file a supplement in this case, as required in every case by the Local Rules of the United States District Court for the Eastern District of Tennessee, even though there may or may not be any additional terms. If additional terms are included in the supplement, they are hereby fully incorporated herein.

13. This plea agreement and supplement constitute the full and complete agreement and understanding between the parties concerning the defendant's guilty plea to the above-referenced charge, and there are no other agreements, promises, undertakings, or understandings between the defendant and the United States. The parties understand and agree that the terms of this plea agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void.

|  |  |
|---|---|
| _7/19/17_<br>Date | NANCY STALLARD HARR<br>UNITED STATES ATTORNEY<br>By: _[signature]_<br>Francis M. Hamilton, III<br>David P. Lewen, Jr.<br>Assistant United States Attorneys |
| _7/19/17_<br>Date | _Vicki Borden_<br>Vicki Borden<br>Defendant |
| _7/19/17_<br>Date | _[signature]_<br>Joseph E. Costner<br>Sarah Bean Smith<br>Attorneys for the Defendant |

19

Defendant's Initials _VB_